# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Folakemi A. O.,

           Plaintiff,

v.

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

           Defendant.

Case No. 21-cv-02698 (JRT/DJF)

**REPORT AND
RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Folakemi O. ("Plaintiff") seeks judicial review of a final decision ("Decision") by the Commissioner of Social Security ("Commissioner") that denied her applications for disability insurance benefits ("DIB") and Supplemental Social Security Income ("SSI"). This matter is presented for decision by the parties' briefs. The undersigned considers the briefs pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. For the reasons below, the Court finds that substantial evidence on the record as a whole supports the Commissioner's Decision and recommends that it be affirmed.

## BACKGROUND

### I.    Procedural History

Plaintiff applied for DIB and SSI under Titles II and XVI of the Social Security Act on November 20, 2019, alleging disability as of October 26, 2019. (Soc. Sec. Admin. R. (hereinafter "R.") 260-264.) [1]  Plaintiff identified sickle cell anemia and seizures as disabling conditions.

---

[1]  The Social Security administrative record (R.) is filed at ECF No. 13. For convenience and ease of use, the Court cites to the record's pagination rather than the Court's ECF number and page.

(R. 131, 282.).  When describing how her conditions impacted her ability to function, Plaintiff stated that she could lift up to ten pounds.  (R. 308.)  At the time of her application, Plaintiff was 47 years old (R. 263), held college degrees in technoscience and technology (R. 43), and had past work as a customer service representative, inventory clerk, lounge attendant, retail clerk, and file clerk (R. 77-78, 390).

The Commissioner denied Plaintiff's application initially (R. 126-131) and on reconsideration (R. 136-137).  At Plaintiff's request (R. 139-140), an Administrative Law Judge ("ALJ") held a telephonic hearing on December 16, 2020 (R. 34-63), continued on April 21, 2022 (R. 64-89), during which Plaintiff—represented by an attorney—and a vocational expert testified (R. 12).  The ALJ issued a written decision on May 4, 2021, finding Plaintiff not disabled and denying her claim.  (R. 9-33.)  On October 25, 2021, the Social Security Administration Appeals Council denied Plaintiff's request to review the ALJ's decision.  (R. 1- 5.)  Plaintiff filed this action on December 20, 2021.  (ECF No. 1.)

Plaintiff argues that the ALJ committed significant errors of law when determining her residual functional capacity ("RFC"),[2] and that the ALJ's findings were not based on substantial evidence.  (ECF No. 15 at 1.)  She asks the Court to reverse the Commissioner's Decision and award benefits, or in the alternative, remand the case for further proceedings before the Commissioner.  (*Id.*)  The Commissioner maintains that the ALJ correctly evaluated the evidence, and that substantial evidence supports the ALJ's findings.  (ECF No. 18.)  Accordingly, the Commissioner asks the Court to affirm the Decision.  (*Id.*)

---

[2] RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

## II.     Medical Evidence

The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' briefs.  Because Plaintiff argues that the ALJ's determination related to her RFC does not reflect all of her limitations, the Court's analysis centers on diagnoses related to the limitations she highlights.  (*See* ECF No. 15 at 15-23, citing Sickle Cell Anemia, seizure disorder, and certain mental health diagnoses.)

Plaintiff suffers from Sickle Cell Anemia ("SCA") and essential thrombocytosis.  (*See, e.g.*, R. 731, 748, 752, 757, 760.)  She also suffers from mental health conditions, including depression and anxiety.  (*See, e.g.*, R. 475, 501, 520-521, 662, 1636.)  On several occasions, Plaintiff sought emergency care related to these conditions.  (*See, e.g.,* R. 428-437, 495-496, 501, 520-521, 541.)  Dr. Cathleen Chen, a hematologist, treated Plaintiff for her SCA and essential thrombocytosis.  (*See, e.g.*, R. 731-733, 748-759.)  Plaintiff also sought treatment at primary care and neurology clinics.  (*See, e.g.,* R. 604-698, 672-691, 607-608, 937-970.)

### A.     Emergency Care

On October 2, 2018, before the alleged onset date of her disability, Plaintiff sought treatment in an emergency room for a sickle cell crisis with pain that presented in her left leg and radiated up her back.  (R. 541.)  She reported it was too painful to walk, and that Tylenol was ineffective.  (R. 547.)  Plaintiff's hemoglobin level was 7.8g/dl, below the normal range of 11.7-15.7g/dl, her hematocrit level was 20.7%, below the normal range of 34-45%, and her reticulocyte count was 7.2%, above the normal range of 0.5-1.8%.  (R. 539.)  Plaintiff was admitted to the hospital and discharged on October 4, 2018.  (R. 553.)

Plaintiff was admitted to the hospital again in early March 2019 to receive treatment for depression and anxiety after experiencing olfactory hallucinations.  (R. 475, 520-521.)  A

subsequent electroencephalogram ("EEG") showed a focus of spike activity in the left frontal region of Plaintiff's brain, and magnetic resonance imaging ("MRI") revealed white matter changes. (R. 503-504.) Plaintiff's medical providers prescribed Keppra to assist with presumed seizures that likely caused her olfactory hallucinations. (R. 503.)

Plaintiff sought emergency treatment again on April 28, 2019 for another sickle cell crisis with pain on the right side of her body, fatigue, chills, and a headache, and blood in her urine. (R. 434-437.) Her hemoglobin was 8.5g/dl and her hematocrit level was 24%—both abnormally low—but she was alert and oriented with no focal neurologic deficits on exam. (R. 434, 437.) Plaintiff's medical providers discharged her with instructions to follow up at her primary care clinic. (R. 434-435.) On May 2, 2019, Plaintiff returned to the emergency room for care related to chest/back pain, chills, a sore throat, and sores on her tongue. (R. 428-433.) Her hemoglobin was 8.0g/dl and her hematocrit was 21.5%. (R. 432.) Plaintiff's medical providers discharged her with instructions to follow up with her hematologist it the next two days. (R. 429.)

On September 20, 2019, Plaintiff took an ambulance to the emergency room for diffuse pain, fatigue, and numbness and tingling. (R. 501.) She reported to hospital staff that she was experiencing stress and anxiety related to her ability to maintain employment. (R. 501.) Plaintiff's medical providers determined her symptoms were likely secondary to her stress and anxiety. (R. 502.) On December 20, 2019, Plaintiff sought emergency treatment again for a severe frontal headache. (R. 496.) She returned the next day to due to a nosebleed, coughing up blood, and intermittent headaches. (R. 495.) Plaintiff's medical providers again advised her to follow up at her primary care clinic. (R. 496.)

On January 4, 2021, Plaintiff sought emergency treatment for left lower quadrant abdominal pain that did not improve with Tylenol. (R. 1660.) An abdominal computerized

tomography ("CT") scan did not explain Plaintiff's pain but did show splenic atrophy and chronic bilateral renal infarcts consistent with her history of SCA. (R. 1673.)

## B.    Hematology Care

In January 2019, Plaintiff saw Dr. Cathleen Chen for care related to her SCA and essential thrombocytosis. (R. 731-733.) Plaintiff's hemoglobin level then was 8.8g/dl. (R. 732.) Dr. Chen noted Plaintiff was clinically stable with respect to those conditions and advised that she remain on current medications. (R. 733.) According to Dr. Chen's medical notes: (1) Plaintiff reported moderate discomfort due to joint pain but was not in acute distress; (2) Plaintiff did not have clubbing, cyanosis, or edema of her extremities, nor swelling or erythema of any joint; (3) Plaintiff was alert and oriented, her cranial nerves and motor exam were grossly intact, and she had good bilateral upper extremity strength; and (4) Plaintiff had point tenderness in her right paraspinal area and medial to the right lower scapula but had no other skin lesions, muscular nodules, or bony deformities. (R. 732.) Dr. Chen also noted Plaintiff had an abnormal MRI of her liver, which Dr. Chen opined was consistent with iron deposition. (R. 732.) She recommended Plaintiff try a course of Exjade before trying iron chelation therapy to reduce the iron overload. (R. 733.) She also recommended monthly blood draws. (R. 737.)

Plaintiff saw Dr. Chen again on August 8, 2019 (R. 748-750), November 1, 2019 (R. 752-754), and January 31, 2022 (R. 757-759). On each visit, Plaintiff's hemoglobin level remained at 8.8g/dl and she continued to take the same medications. (R. 749, 753, 758.) Dr. Chen noted on each occasion Plaintiff was doing well since her last visit and did not have any current unusual headaches, visual changes, shortness of breath, dyspnea, unusual cough, diminished appetite or unusual weight loss, nor any asymmetric and ongoing bony discomforts related to her prior pain crisis. (R. 748, 752, 757.) Dr. Chen's medical notes from each visit similarly reflect that:

(1) Plaintiff continued to experience joint pain but was not in acute distress; (2) Plaintiff did not have clubbing, cyanosis, or edema of her extremities, nor swelling or erythema of any joint; (3) Plaintiff was alert and oriented, her cranial nerves and motor exam were grossly intact, and she had good bilateral upper extremity strength; and (4) Plaintiff continued to experience point tenderness in the right paraspinal area and medial to the right lower scapula, but had no other skin lesions, muscular nodules, or bony deformities. (R. 748, 753, 758.) Dr. Chen also continued to recommend monthly blood draws. (R. 749, 753, 758.)

On July 31, 2020, Plaintiff had a phone visit with Dr. Chen. (R. 976-978.) Dr. Chen noted that Plaintiff: (1) was doing well since her last visit and had had no pain crisis episodes; (2) had recently resumed taking a medication for essential thrombocytosis after three weeks without it due to difficulty filling the prescription; (3) had no recent neurologic abnormalities; (4) had no recurrent seizures while properly taking Keppra; and (5) did not report current unusual headaches, visual changes, shortness of breath, dyspnea, unusual cough, diminished appetite, or unusual weight loss. (R. 977.) Dr. Chen also noted that she discussed scheduling Plaintiff for iron chelation to treat the iron overload in her liver. (R. 977.) She explained that, once started, the infusion would initially last four to six hours a day, five days a week. (R. 977.) Dr. Chen also continued to recommend monthly blood draws. (R. 978.)

Plaintiff saw Dr. Chen again in person on October 30, 2020. (R. 1501-1503.) Dr. Chen noted that Plaintiff: (1) had no recurrent seizures since she started taking Keppra; (2) did not report any pain crisis; (3) did report feeling somewhat achy in her back, hips, and arms, but that the pain was manageable with Tylenol; (4) was tolerating her current medications, though she had missed about a week of dosing for one medicine which she was not able obtain on time; (5) denied any current unusual headaches, visual changes, shortness of breath, dyspnea, unusual cough,

diminished appetite, or unusual weight loss.  (R. 1503.)  Dr. Chen continued to recommend monthly blood draws and further noted Plaintiff still needed iron chelation but explained that it was delayed due to the COVID-19 pandemic.  (R. 1503.)

On April 13, 2021, Dr. Chen opined that Plaintiff's SCA limited her ability to perform work-related activities insofar as she could: (1) occasionally lift or carry less than ten pounds: (2) frequently lift or carry less than five pounds; (3) stand or walk for less than two hours in an eight-hour day; and (4) sit for less than six hours in an eight-hour day.  (R. 1680-1681.)  Dr. Chen cited Plaintiff's joint and paraspinal pain and noted that Plaintiff risked a pain crisis if she over-exerted herself.  (R. 1681.)  She also opined that Plaintiff's SCA limited her ability to push and pull with her upper and lower extremities; occasionally limited her ability to move her neck, balance, and stoop; and frequently limited her ability to manipulate her dominant hand.  (R. 1681-1682.)  Dr. Chen reiterated that over-exertion could exacerbate Plaintiff's SCA and create a pain crisis that could lead to hospitalization.  (R. 1681.)  She further opined that Plaintiff should avoid moderate exposure to noise, and all exposure to: (1) extreme cold and heat; (2) wetness; (3) humidity; (3) vibration; (4) fumes, odors, dusts, gases, poor ventilation, etc.; and (4) other hazards such as machinery or height.  (R. 1683.)

### C.    Primary and Neurological Care

On February 20, 2019, Plaintiff visited her primary care clinic after severely biting her tongue the previous night.  (R. 681-684.)  She reported falling asleep at the dinner table and waking up to cuts on her tongue from biting down and diffuse pain throughout her body.  (R. 681.)  Dr. Alyssa Cruz noted Plaintiff appeared slow and withdrawn and her cognition and memory were impaired.  (R. 683.)  She could not determine the etiology of how Plaintiff bit herself but

encouraged Plaintiff to hydrate and use Tylenol for pain.  (R. 683.)  Plaintiff's medical providers later presumed this was her first seizure.  (*See, e.g.*, R. 658.)

On May 2, 2019, Plaintiff visited her primary care clinic after she was treated in the emergency room that morning.  (R. 677.)  She explained that her tongue was swollen, she was fatigued, experiencing cold-like symptoms, and her back and head hurt.  (R. 677.)  Dr. Julie Amaon examined Plaintiff and observed a fresh laceration on the left side of her tongue.  (R. 678.)  She noted Plaintiff was slow, her affect was blunt, her speech was delayed, and she exhibited abnormal recent memory.  (R. 678.)  Dr. Amaon further noted that because Plaintiff had previously bitten her tongue, she was concerned about possible seizure activity.  (R. 678.)

Plaintiff returned to her primary care clinic on May 8, 2019 for a recommended follow-up after her sickle cell crisis on April 28, 2019.  (R. 675.)  Plaintiff recounted her recent episodes of falling asleep and biting her tongue.  (R. 675.)  Upon assessment, Dr. Carrie Link noted concerns for seizure activity and Plaintiff's cognitive recall ability.  (R. 676.)

Plaintiff returned to her primary clinic again on September 25, 2019 to follow up after her visit to the emergency room five days before.  (R. 672-674.)  Plaintiff reported she felt stress and anxiety related to starting a new job and was experiencing fatigue, sleep disturbance, decreased appetite, and difficulty concentrating.  (R. 672-673.)  Dr. Jacquelyn Cameron referred Plaintiff to the Noran Neurology Clinic and suggested treatment for depression if a neurological workup did not suggest an etiology for Plaintiff's symptoms.  (R. 674.)  Dr. Cameron also recommended Plaintiff's work hours and/or workload be temporarily reduced until her symptoms were under control.  (R. 1223.)

Plaintiff visited the Noran Neurology Clinic on October 8, 2019, but the evaluation was limited because the clinic lacked access to all of Plaintiff's relevant medical records.  (R. 607-

608.)  Dr. Mary Jane Chiasson noted while Plaintiff was alert, she was vague, inconsistent, sometimes uncooperative, and exhibited limited attention and concentration.  (R. 608.)  She further noted while Plaintiff had give-away weakness throughout, she appeared to have full strength in all four extremities, her coordination was normal, and she had a normal gait.  (R. 608.)  Dr. Chiasson diagnosed Plaintiff with a seizure disorder and advised her to return with all relevant medical records.  (R. 609.)  Plaintiff returned on February 11, 2020, this time accompanied by a friend to help review the historical information in Plaintiff's medical records, but again without all of the necessary records for Dr. Chiasson to complete a comprehensive evaluation.  (R. 604-606.)  During this visit, Dr. Chiasson noted Plaintiff was alert and oriented and her attention and concentration were fair.  (R. 605.)  She also noted Plaintiff's motor power was strong and symmetrical and her movement, gait, and station were normal.  (R. 606.)

Plaintiff transferred her neurology care to Health Partners in June 2020.  (R. 937.)  Dr. Teresa A. Tram Lim noted that: (1) Plaintiff was a poor historian and could not tell her whether she had ever suffered an SCA pain crisis: (2) Plaintiff first reported her seizures started in 2019 and she had had just one; (3) Plaintiff later reported she also had seizures in March, April, May, and June 2019; (4) Plaintiff was prescribed Keppra in early 2019 but did not start taking it until August 2019; (5) Plaintiff had another seizure in October 2019 after not taking Keppra for two days; (6) Plaintiff did not report any seizures after October 2019; and (7) Plaintiff reported two weeks of right-side numbness in her body.  (R. 937.)  Dr. Tram Lin directed Plaintiff to obtain a blood test to measure the level of Keppra in her blood, ordered an EEG to assess for seizures, and ordered an MRI of Plaintiff's brain to determine whether Plaintiff had suffered a stroke.  (R. 944-945.)  The MRI did not show a stroke and was consistent with Plaintiff's earlier MRI studies.  (R. 952, 966.)  Plaintiff's EEG was also normal (R. 958, 966), and the level of Keppra in her blood

was appropriate. (R. 966.) Plaintiff followed up with Dr. Tram Lin in July 2020 and clarified again that she had had no seizures in 2020, but that her memory was poor. (R. 966.) She also reported the numbness in her body had resolved. (R. 966.) Dr. Tram Lin noted that Plaintiff: (1) was fully alert and oriented; (2) participated in her clinical review with good comprehension of discussion; and (3) had 5/5 bilateral strength with no drift. (R. 970.) She further noted Plaintiff's seizures appeared to be under control with medication, and that she discussed with Plaintiff the importance of taking her medicine consistently. (R. 970.) Dr. Tram Lin recommended Plaintiff return annually for follow-up visits. (R. 970.)

On March 11, 2021, Plaintiff visited her primary care clinic to discuss pain and deformity in her right hand and pain in her right shoulder. (R. 1442.) Plaintiff reported that lifting objects significantly increased her pain. (R. 1442.) Dr. Gina Groshek noted generalized weakness in both of Plaintiff's upper extremities and that Plaintiff's chronic pain worsened with muscle use. (R. 1444.)

### D.    Mental Health Care

Plaintiff established care with psychiatrist Dr. Glen Rebman on December 13, 2019. (R. 658-663) and met with him again in person on March 26, 2020 (R. 641-647), and by telephone on May 14, 2020 (R. 875-884). Dr. Rebman noted Plaintiff's first seizure was likely in February 2019, and that her seizures may relate to advancement of her SCA. (R. 658.) He also noted Plaintiff was prescribed medication to help with her seizures and while Plaintiff denied any side effects, she had limited insight. (R. 658.) Dr. Rebman further documented that Plaintiff commented that people were watching her and may be stalking her. (R. 658.) During the telephone visit in May 2020, Plaintiff's speech was delayed with frequent pausing and she had some difficulty understanding words. (R. 878.) According to Dr. Rebman's notes, Plaintiff: (1) reported

10

some increased anxiety due to COVID-19; (2) denied any depression or anxiety and was not interested in medication treatment; (3) reported a myriad of trauma symptoms; and (4) continued to have memory problems.  (R. 876, 880.)  He concluded Plaintiff likely suffered from post-traumatic stress disorder and an unspecified depressive disorder, and that her poor physical health and life stressors may have contributed to worsening mental health.  (R. 662, 880.)  He opined that because of Plaintiff's marked impairments in memory, concentration, organizational ability, intellectual function, and energy, she could not meet deadlines or keep pace with job tasks. (R. 647, 881.)  He further opined that because of Plaintiff's memory problems, trauma symptoms, SCA, essential thrombocytosis, and depression, she could not interact with coworkers or supervisors in an effective and productive manner, and that she could not reliably attend a job because of her inability to leave home due to frequent symptom exacerbation.  (R. 647, 881.)  He determined that with appropriate treatment, Plaintiff could potentially rejoin the workforce, but that it would likely take at least a year.  (R. 647, 881.)

On February 3, 2020, Plaintiff sought treatment at the Associated Clinic of Psychology. (R. 599-598.)  Professionals at the clinic concluded Plaintiff qualified for in-home adult rehabilitative mental health services ("ARMHS") because of Plaintiff's "confusion/disorientation/risk" of not getting safely to a clinic and started biweekly sessions soon after.  (R. 597, 1647.)

In August 2020, Plaintiff's ARMHS worker documented Plaintiff's thought processes as "tangential" during one in-person meeting, but "intact" at a subsequent meeting.  (R. 913-916.) The ARMHS workers also documented Plaintiff's thought processes as "intact" during several phone meetings.  (*See, e.g.*, R. 1590, 1592, 1595, 1597, 1599, 1601, 1612, 1637.)   On December 30, 2020, Plaintiff reported a history of auditory hallucinations and feeling that she was

being watched. (R. 1643.) She also expressed confusion about why she needed a psychiatrist. (R. 1643.) Many times, Plaintiff's ARMHS workers noted that Plaintiff appeared fatigued. (*See, e.g.*, R. 597-598, 889, 910, 1564.) In February 2021, Plaintiff told her ARMHS workers that she often felt depressed but was less anxious and felt improvements in other areas, including concentration and focus. (R. 1638.) Plaintiff also reported she maintained hope that her condition would improve and she could return to work. (R. 1641.)

On April 1, 2021, Dr. Deanna Bass, on behalf of Dr. Rebman, completed a medical source statement reflecting Plaintiff had marked limitations in her ability to: (1) remember and understand detailed instructions; (2) make judgments on simple work-related decisions; and (3) respond appropriately to work pressures in a usual work setting. (R. 1684-1685.) The opinion added that Plaintiff's cognitive deficits and fatigue impaired her ability to perform a daily job. (R. 1685.)

### E.    Administrative Medical Findings

Upon Plaintiff's initial application, Dr. Hallie Richards, a state agency physician who assessed Plaintiff's RFC, concluded Plaintiff had exertional limitations insofar has Plaintiff could: (1) occasionally lift and carry up to 20 pounds; (2) frequently lift and carry up to 10 pounds; (3) stand and/or walk, and sit (with normal breaks) for about 6 hours in an 8-hour day; and (4) push and/or pull unlimitedly, other than to lift and carry. (R. 97-98.) Dr. Richards also concluded Plaintiff had: (1) postural limitations insofar as Plaintiff could (a) never climb ladders, ropes, or scaffolds; (b) occasionally balance and climb ramps and stairs; and (c) frequently stoop, kneel, crouch, and crawl; and (2) environmental limitations insofar as Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (R. 98-99.) At the reconsideration level, Dr. George Erhard largely agreed with Dr. Richards, but concluded Plaintiff was also limited

insofar as she should avoid even moderate exposure to hazards such as machinery and heights. (R. 118-119.)

As for Plaintiff's mental RFC, Dr. Ray M. Conroe assessed Plaintiff upon her initial application and concluded that Plaintiff: (1) retained the mental capacity to concentrate on, understand, and remember routine, repetitive, and 3-4 step uncomplicated instructions; (2) could likely carry out routine, repetitive, and 3-4 step uncomplicated tasks with adequate persistence and pace; (3) had significant limitation in her capacity to cope with co-workers but was likely able to handle brief, infrequent, and superficial contact; (4) had limited ability to handle public contact but was likely able to handle brief, infrequent, and superficial contact; (5) had limited ability to handle supervision due to reduced stress tolerance but was likely able to cope with the typical supervisory styles of most work places settings; and (6) had limited ability to respond appropriately to stress in the workplace but was likely able to handle stressors of a 3-4 step task setting. (R. 101.) At the reconsideration level, Dr. Michelle Hoy-Watkins agreed with Dr. Conroe's assessment. (R. 121.)

Dr. Alford Karayusuf, who performed a consultative exam of Plaintiff's mental status on February 3, 2020, similarly concluded that Plaintiff: (1) could understand, retain, and follow instructions; (2) was restricted to work that involved brief, superficial, and infrequent interactions with fellow workers, supervisors, and the public; and (3) that within the context of performing only simple, routine, repetitive, concrete, tangible tasks, and within the two previous parameters, Plaintiff could maintain pace and persistence. (R. 580-582.)

## III.    Administrative Hearing

During her hearing on December 16, 2020, Plaintiff described her past employment, though she struggled to recall certain details. (R. 43-47.)  She also testified she takes medicine for SCA,

but there are no other treatments available.  (R. 55.)  She explained she had five SCA pain crises in 2020 and each lasted three to seven days (R. 56-57).  She said she did not seek treatment for these crises because she was concerned about contracting COVID-19.  (R. 61).  She further testified her pain crises are unpredictable (R. 55) and they severely limit her ability to function (R. 56-57).  Plaintiff explained that during a pain crisis, she feels very tired and intense pain in her arms, chest, legs, and head.  (R. 57.)  Plaintiff further explained that even when she is not in a pain crisis, SCA impacts her ability to work because it makes her tired and limits her ability to stand. (R. 58-60.)  During her hearing on April 21, 2021, Plaintiff testified she had three additional SCA pain crises since the first hearing on December 16, 2020.  (R. 74.)

After Plaintiff's testimony, vocational expert, William Villa, testified that a hypothetical person with Plaintiff's age, education, and work experience who was limited to:  (1) light work; (2) never climbing ladders, ropes, or scaffolds; (3) occasionally climbing ramps and stairs; (4) no balancing on narrow, slippery, or erratically moving surfaces; (5) frequent stooping, kneeling, crouching, and crawling; (6) no work at unprotected heights or having operational control of moving dangerous machinery; (7) simple, routine instructions and tasks; and (8) occasional interaction with supervisors, coworkers, and the general public could not perform Plaintiff's past relevant work; however, the hypothetical person could perform in occupations such as semiconductor marker, unskilled assembly, or unskilled inspection.  (R. 78-79.)  Mr. Villa testified if the hypothetical person was also limited to no public contact, that person could still work in the above occupations.  (R. 79.)  If the hypothetical person was also limited to low-stress work, defined as involving only: (1) simple work-related decisions; (2) occasional changes in work-setting; and (3) no production-based work, Mr. Villa testified the hypothetical person could still be employed as a semiconductor marker, in unskilled inspection, or as a bakery line worker.  (R. 79-80.)  If the

hypothetical person was further limited to sedentary work, the person could be employed as a semiconductor bonder or optical accessory publisher. (R. 80.) Mr. Villa added that there would be no work available for a hypothetical person with all of the above limitations if the person could sit for only five hours and walk for one-and-a-half hours during an eight-hour period. (R. 82.) He similarly testified that there would be no work for a hypothetical person who: (1) was off task 20 percent of the workday; (2) needed reminders to stay on task every 30 minutes; or (3) was absent more than twice each month for two to three straight months without a prearranged accommodation or understanding. (R. 81-82.) Finally, Mr. Villa testified that a hypothetical person limited to only occasional bilateral reaching would also be precluded from competitive work. (R. 85.)

## IV.    The ALJ's Written Decision

The ALJ issued a written decision on May 4, 2021 finding Plaintiff not disabled. (R. 9–33.) Pursuant to the five-step sequential analysis outlined at 20 C.F.R. §§ 404.1520(a), and 416.920(a),[3] the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset date of her disability; (2) suffered from the following impairments that, at least in combination, were severe: sickle cell anemia with essential thrombocytosis; seizure disorder; borderline intellectual functioning; and major depressive disorder with psychotic features; (3) did not have a listed impairment or a combination of impairments that met or medically equaled a listed impairment as defined in 20 C.F.R. Part 404, Subpart P, Appendix I ("Listing of

---

[3] The five steps are: (1) whether the claimant's work activity was substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and past relevant work; and (5) the claimant's RFC and whether she can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(i)–(v).

Impairments" or "Listing")[4]; (4) could not perform any of her past work but retained the functional capacity (RFC) to:

> perform a range of work at a "sedentary"[5] level of exertion, as defined in 20 CFR 404.1567(a), subject to all of the following additional limitations: she can never climb ladders, ropes, and scaffolds; she can occasionally climb ramps and stairs; she should not be required to balance on narrow, slippery, or erratically moving surfaces; she could frequently stoop, kneel, crouch, and crawl; she should not work at unprotected heights or have the operational control of moving, dangerous machinery; she could understand, remember, and carry out simple, routine instructions and tasks; she could have occasional interaction with supervisors and coworkers, but she should not be required to work with the general public; and she would be limited to low stress defined as work involving only simple work-related decisions, only occasional changes in the work setting, and no production-paced work, such as on a moving assembly line or work involving hourly quotas, while bench work and daily quotas would be all right;

and (5) was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 14-26.) The ALJ found Plaintiff could adjust to other work that exists in sufficient numbers in the economy and concluded Plaintiff was not disabled. (R. 27.)

To determine Plaintiff's RFC, the ALJ considered the entire record, including Plaintiff's reported symptoms and limitations, as well as medical opinion evidence, and prior administrative medical findings. (R. 19-25.) The ALJ found that while Plaintiff's medical determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not generally consistent with the medical evidence and other evidence in the record. (R. 20.) The ALJ noted that while Plaintiff's hemoglobin levels were low, they were consistently above 8g/dl. (R. 21.) The ALJ further noted that Plaintiff: (1) inconsistently denied pain and sickle cell crises; (2) did

---

[4]    The Listing of Impairments is a catalog of presumptively disabling impairments categorized by the relevant "body system" impacted. *See* 20 C.F.R Part 404, Subpart P, App. 1.

[5]    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). A sedentary job is not limited to sitting; it may also include occasional walking and standing if other sedentary criteria are met. *Id.*

not appear to treat her SCA since 2019; (3) did not appear to report pain crises when she did treat; (4) and her overall pain treatment had been conservative. (R. 21, citing, e.g., R. 434-437, 748-750, 752-754, 604-608, 937, 1501-1503.) The ALJ concluded Plaintiff's RFC warranted some limitations due to Plaintiff's inconsistent seizure reports, generalized slight weakness, and low hemoglobin levels, but that the medical record of evidence did not support limitations beyond which she included. (R. 22.)

As for Plaintiff's mental impairments, the ALJ noted Plaintiff's cognitive findings were inconsistent and that Plaintiff did not take any psychotropic medication. (R. 23, citing, e.g., R. 94, 114, 580-583, 876-878, 880, 913-914, 966, 1582, 1590, 1595, 1613, 1636-1638.) She also noted the record did not consistently reflect that Plaintiff suffered from a severe mental impairment or severe combination of mental impairments in the Listing. (R. 24.) The ALJ concluded that while the record was consistent with some limitations to Plaintiff's RFC to accommodate Plaintiff's mental impairments, it was not consistent with limitations beyond those she included. (R. 23-24.)

The ALJ also explained her consideration of medical opinion evidence and prior administrative findings, including whether and how they persuaded her. (R. 24.) The ALJ found the prior administrative findings related to Plaintiff's physical health persuasive insofar as they related to postural and environmental limitations; but she did not find them persuasive as to limitations regarding exertional and frequent posturing and balancing because they were not consistent with Plaintiff's reported fatigue and muscle weakness. (R. 24.) As for the administrative findings related to Plaintiff's mental status, the ALJ found the 3-4 step task limitation overly restrictive given Plaintiff's minimal and conservative mental health treatment and inconsistent cognitive findings. (R. 24.) She otherwise found the administrative findings persuasive, but given Plaintiff's reported anxiety and difficulty with stress and pace, the ALJ

further precluded public contact and included a "low stress" limitation in Plaintiff's RFC. (R. 24.)

The ALJ did not find Dr. Gabor, Dr. Chen, or Dr. Rebman's medical opinions persuasive. (R. 24.) She explained that: (1) Dr. Gabor's opinions were inconsistent with most of Plaintiff's mental status examination findings, as well as Plaintiff's minimal and conservative mental health treatment; (2) Dr. Chen's opinion was vague, not well supported internally, and not generally consistent with Plaintiff's medical examinations; and (3) Dr. Rebman's opinion was not persuasive, particularly in light of Plaintiff's inconsistent cognitive findings and limited mental health treatment. (R. 24-25.) The ALJ also explained that she did not find persuasive or valuable any conclusory statement about Plaintiff's ability or inability to work because that is an issue reserved to the Commissioner. (R. 25.)

Plaintiff argues that: (1) the ALJ's RFC does not reflect all of her limitations insofar as it (a) does not reflect the intermittent/waxing and waning nature of her impairment or (b) reflect the frequent, reasonable, anticipated absences she requires; and (2) substantial medical evidence supports a more restrictive RFC. (ECF No. 15 at 15-23.)

## DISCUSSION

## I.    Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable

mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Supreme Court explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence ... is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "[The] Court considers evidence that detracts from the Commissioner's decisions, as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (quoting *Travis*, 477 F.3d at 1040). "If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (quoting *Travis*, 477 F.3d at 1040). In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Cruz v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). The claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Barnhart, v. Walton*, 535 U.S. 212, 217-22 (2022); *see also*, *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## II.    Analysis

Plaintiff argues the ALJ erred by failing to consider all of her limitations when determining her RFC.  (ECF No. 15 at 25-23.)  Plaintiff specifically contends the ALJ's RFC does not reflect the intermittent/waxing and waning of her impairment, nor reflect the frequent, reasonable anticipated absences she requires.  (*Id.* at 19-23.)  She further argues substantial evidence supports a more restrictive RFC.  (*Id.* at 17-18.)  The Court finds substantial evidence supports the ALJ's RFC determination, and that Plaintiff failed to meet her burden to show additional limitations were warranted.

RFC is defined as the most a claimant can do despite her limitations, including both physical and mental limitations.  20 C.F.R. § 404.1545(a).  It is the claimant's burden to prove her RFC.  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own descriptions of her limitations.  *See*  20 C.F.R. § 404.1545(a)(3); *see also*, *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *Roberts v. Apfel*, 222 F.3d, 466, 469 (8th Cir. 2000).  "Because a claimant's RFC is a medical question, an ALJ's assessment must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Hensley*, 829 F.3d at 932 (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007).  Moreover, the "ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional."  *Baldwin*, 349 F.3d at 556.  The ALJ must determine the claimant's RFC based on all of the relevant medical and non-medical evidence.  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016); 20 C.F.R. § 404.1545(a)(3).  Finally, an ALJ's RFC

determination is acceptable if it is supported by at least some medical evidence based on the ALJ's independent review of the record. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).

Here, the ALJ determined that while Plaintiff could not perform her past relevant work, she retained the RFC to perform sedentary work with a number of postural, environmental, and mental restrictions. (R. 18-19.) Having carefully reviewed the record, Court finds that substantial evidence supports the ALJ's RFC determination and overall conclusion that Plaintiff was not disabled during the relevant timeframe. The ALJ thoroughly explained her analysis of the relevant evidence, including Plaintiff's subjective statements and testimony, the objective medical evidence, and the medical opinions and prior administrative medical findings. (R. 19-25.) She also consulted a vocational expert who testified during Plaintiff's administrative hearings that a hypothetical person with Plaintiff's vocational profile and limitations reflected in Plaintiff's RFC could not perform any of Plaintiff's past work but could perform other work existing in significant numbers in the national economy.[6] (R. 18-19, 25-26, 77-81.)

The ALJ described how Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms was not generally consistent with her medical records including: (1) Plaintiff's hemoglobin levels; (2) that Plaintiff inconsistently denied pain and sickle cell crises; (3) the limited extent to which Plaintiff sought treatment for her SCA since 2019; (4) that Plaintiff did not always report her SCA when she did seek medical treatment; and (5) that, overall, Plaintiff's pain treatment was relatively conservative. (R. 21, citing, e.g., R. 434-437, 748-750, 752-754, 604-608, 937, 1501-1503.) The ALJ also noted inconsistencies in Plaintiff's cognitive findings, and that Plaintiff did not take psychotropic medication. (R. 23, citing, e.g., R. 94, 114,

---

[6] The VE specifically identified the representative unskilled occupations of semiconductor bonder and optical accessory polisher. (R. 81.)

580-583, 876-878, 880, 913-914, 966, 1582, 1590, 1595, 1613, 1636-1638.)    The Court has reviewed the ALJ's findings and concludes they are supported by the record.

The ALJ further described her consideration of medical opinion evidence and prior administrative findings, including whether and how they persuaded her.  (R. 24.)  Under 20 C.F.R. § 404.1520(c), an ALJ evaluates the persuasiveness of medical opinions by considering: (1) whether they are supported by objective medical evidence; (2) whether they are consistent with other medical sources; (3) the relationship that the source has with the claimant; (4) the source's specialization; and (5) any other relevant factors. 20 C.F.R. § 404.1520c(c).   The first two factors—supportability and consistency—are the most important.  20 C.F.R. § 404.1520c(a).

The ALJ generally found the prior administrative findings persuasive but explained that she: (1) disagreed with the exertional and frequent postural and balancing findings because they were not consistent with Plaintiff's reported fatigue and muscle weakness; and (2) was not persuaded by a mental limitation that she found overly restrictive.  (R. 24.)  The ALJ did not find Dr. Gabor, Dr. Chen, or Dr. Rebman's medical opinions persuasive, noting internal and external inconsistencies, vagueness, and/or Plaintiff's limited treatment to support their conclusions. (R. 24-25.)

Plaintiff contends the ALJ wrongly discounted Dr. Chen's opinion that Plaintiff "would struggle to lift at least ten pounds in a work setting" and could only reach bilaterally.  (ECF No. 15 at 18-19, citing R. 1681-1682.)  Plaintiff argues that Dr. Chen's opinion is consistent with Dr. Chen's own records and records from Plaintiff's other medical providers.  (*Id.* at 18-19, citing R. 483, 486-87, 490, 597-598, 672-73, 678, 682, 684, 889, 911,1223, 1442, 1444.)  As the ALJ noted, however, Plaintiff wrote in her functional report that she could lift up to 10 pounds (R. 19, citing R. 308).  Moreover, Dr. Richards, who assessed Plaintiff's RFC upon her initial application for

benefits, and Dr. Erhard, who assessed Plaintiff's RFC upon Plaintiff's request for reconsideration, determined that Plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds and that she did not have a reaching limitation.  (R. 19, citing R. 97-98, 110.)  Although Plaintiff may disagree with the ALJ's findings, the Court finds the ALJ properly evaluated Dr. Chen's opinion and supported her conclusion with sufficient evidence that a reasonable mind could accept it.  *Biestek*, 139 S.Ct. at 1154.

To the extent Plaintiff argues the ALJ's RFC does not account for the waxing and waning nature of SCA, nor reflect the frequent, reasonable anticipated absences she requires (ECF No. 15 at 21-22), Plaintiff bore the burden to prove these limitations.  *Baldwin*, 349 F.3d at 556.  The mere presence of a condition such as SCA is not the dispositive issue in a disability evaluation; rather, the ALJ must consider the claimant's actual and specific functional limitations resulting from the condition.  *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) ("[T]he ALJ properly focused on the functional limitations caused by [Plaintiff's condition].").

Here, the ALJ properly considered the relevant evidence before her and determined that no additional limitations were warranted.  And, as discussed above, there is substantial evidence to support the ALJ's findings.  While Plaintiff argues the ALJ wrongly interpreted her fluctuating physical symptoms and mental findings as evidence of good health, (*id.* at 20-22, citing R. 24-25), the ALJ properly supported her findings with a variety of citations to the record evidence, including the administrative findings, the vocational expert's testimony, and her own review of Plaintiff's medical records.  Plaintiff emphasizes, and the record reflects, that Plaintiff was frequently fatigued (*see, e.g.*, R. 597-598, 673, 677, 684, 889, 910, 1112, 1564), and that her condition was made worse when she tried to work or increase her daily activities (*see, e.g.*, R. 501, 673).  But this evidence does not identify any specific functional limitation not accounted for by the ALJ.

(*See* R. 18-19, limiting Plaintiff to sedentary work with various other limitations.)  Moreover, there is other evidence, that Plaintiff either had not experienced or treated any seizure or SCA pain crisis since 2019 (*see, e.g.*, R. 966, 1503), and that her SCA had been clinically stable since that time (*see, e.g.,* 733, 748, 752, 757, 977, 1503).  Whether or not Plaintiff's condition waxes and wanes, the Court finds sufficient evidence that a reasonable mind could accept the ALJ's conclusion that no additional limitations were warranted.  *Biestek*, 139 S.Ct. at 1154.

Similarly, the Court cannot conclude the ALJ erred by failing to address absenteeism in Plaintiff's RFC.  Plaintiff contends her medical appointments alone would result in multiple absences per month, in addition to her regular pain crises, and that the ALJ wrongly overlooked the vocational expert's testimony that an unskilled workplace would tolerate no more than two absences per month (*id.* at 23).  But Plaintiff did not carry the burden to prove this limitation. While the record is replete with documented medical appointments (*see, e.g.*, R. 484, 604, 889, 918, 921, 937, 959, 978, 982, 994, 999, 1562), and there is an indication in the record that Plaintiff may commence an intensive iron chelation therapy in the future (R. 977), there is no information to substantiate the degree of absenteeism from employment resulting from such appointments. Plaintiff appears to assume, without showing, that each medical appointment would equate to an entire day's absence from work, and overlooks that individuals regularly schedule medical appointments before or after work, or on their days off.  While  Plaintiff's medical appointments would be expected to result in some degree of absenteeism—especially if Plaintiff begins iron chelation treatment—the record does not currently contain uncontroverted evidence that absenteeism would likely preclude Plaintiff from competitive employment.  Based on the evidence before her, the ALJ appropriately concluded that some limitations were warranted, but nothing beyond those she included in Plaintiff's RFC.  Even if the Court were to reach a different

conclusion on *de novo* review, it cannot conclude the ALJ erred in evaluating the evidence or recommend that the ALJ's decisions be reversed. *Nash*, 907 F.3d at1089.

Finally, insofar as Plaintiff argues the Court should reverse the ALJ's decision because substantial evidence supports a more restrictive RFC overall, (ECF No. 15 at 17-19), the Eighth Circuit has rejected this argument and explained that the issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision." *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision. *Chesser*, 858 F.3d at 1164; *see also Nash*, 907 F.3d at 1089 ("If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.") (quoting *Travis*, 477 F.3d at 1040)).

Plaintiff contends the ALJ's RFC does not reflect an appropriate consideration of all the medical evidence because the RFC does not include upper extremity limitations and because various medical providers opined that she could not work full-time outside her home. (ECF No. 15 at 18-19.) The Court observes that the ALJ's restriction to sedentary work definitionally limits Plaintiff's upper extremity use to lifting no more than 10 pounds and only occasionally lifting or carrying small items. *See* 20 C.F.R. § 404.1567(a). Moreover, the ALJ's restriction to no climbing of ladders, ropes, or scaffolds also limits Plaintiff's upper extremity use by precluding activities that require them. (Tr. 18). Plaintiff relies on Dr. Chen's medical opinion to support greater limitations, but as discussed above, the ALJ relied on substantial evidence to properly discount Dr. Chen's opinion. Further, although Plaintiff claims multiple providers opined that she cannot

perform full-time work outside her home, the conclusive determination as to whether a claimant is disabled or able to work is an issue expressly reserved to the Commissioner.  20 C.F.R. § 404.1520b(c)(3)(i).  The ALJ thus properly discarded any conclusory statement about Plaintiff's ability or inability to perform work.  (*See* R. 25.)

## CONCLUSION

For the reasons set forth above, the Court finds that substantial evidence in the record as a whole supports the ALJ's RFC and determination that Plaintiff is not disabled.  The Court therefore recommends that the Commissioner's Decision be affirmed.

## RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    The Commissioner's Decision be **AFFIRMED**; and

2.    Plaintiff's Complaint (ECF No. [1]) be **DISMISSED WITH PREJUDICE**.

Dated: December 28, 2022                         *s/ Dulce J. Foster*
                                                 DULCE J. FOSTER
                                                 United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).